UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

HAROLD DOMBROWSKI,

        Plaintiff,

v.                                  Case No. 3:21-cv-1199-WWB-PDB

WILSON, et al.,

        Defendants.
_____

**ORDER**

THIS CAUSE is before the Court on Defendants Wilson, Cobbs, and Jelks's Motion for Summary Judgment (Doc. 87), Plaintiff's Response in Opposition (Doc. 97), and Defendants' Reply (Doc. 101). For the reasons set forth below, Defendants' Motion will be granted.

**I.**    **BACKGROUND**

Plaintiff, a state inmate, is proceeding through counsel on a Civil Rights Complaint (Doc. 1) for injuries he received when he was working as a cook at Hamilton Correctional Institution ("**HCI**") in 2020.[1] In his Complaint and a declaration offered in opposition to Defendants' Motion (Doc. 97-1), Plaintiff explains that, because of a COVID-19 outbreak at HCI in about July 2020, kitchen workers, including himself, were quarantined and required to relinquish their state-issued safety boots for use by replacement kitchen workers. (See Doc. 1 at 10; Doc. 97-1, ¶ 2). When Plaintiff was recalled to work in

---

[1] Plaintiff initiated this action pro se.

September, no boots were available.  (*See* Doc. 1 at 10; Doc. 97-1, ¶¶ 2–3).  When he reported for work on September 10, 2020, Plaintiff told Defendants Cobbs[2] and Jelks that he refused to cook until he was issued the required boots because he fell in December 2019 when working without boots.  (*See* Doc. 1 at 9, 11; Doc. 97-1, ¶¶ 1, 3).  Defendants allegedly told Plaintiff that if he did not cook, he would incur a disciplinary report ("**DR**").  (*See* Doc. 1 at 11; Doc. 97-1, ¶ 3).  Plaintiff reported the "situation" to Defendant Wilson (the foodservice director), who told Plaintiff she "didn't have time for this shit."  (*See* Doc. 1 at 12; Doc. 97-1, ¶ 4).  Upon the threat of incurring a DR and losing gain time, Plaintiff decided to cook, wearing the only footwear available, "resin crocs," which offered "no protection . . . or traction."  (*See* Doc. 1 at 11; Doc. 97-1, ¶ 4).

On September 13, 2020, at about 4:30 a.m., Plaintiff slipped on the kitchen floor, landing on his right side.  (*See* Doc. 1 at 12; Doc. 97-1, ¶ 5).  Defendants Cobbs and Jelks were assigned to the kitchen when he fell, though it does not appear either witnessed the fall.  (*See* Doc. 1 at 12–13; Doc. 97-1, ¶¶ 5, 6).  Plaintiff asked Defendant Jelks to contact medical, and "she said she would."  (*See* Doc. 1 at 12; Doc. 97-1, ¶ 5).  After thirty minutes passed with no help, Plaintiff asked again.  (*See* Doc. 1 at 12; Doc. 97-1, ¶ 6).  Plaintiff claims he did not receive medical treatment for "nearly five hours" after he fell.  (*See* Doc. 1 at 13; Doc. 97-1, ¶ 6).  Days later, Plaintiff was transported to a hospital because an x-ray showed he had a broken hip.  (*See* Doc. 1 at 16; Doc. 97-1,

---

[2] This Defendant's last name has been spelled as "Cobb," without an 's,' but at her deposition, she clarified her last name has an 's' at the end, despite how it is spelled in her personnel file and on her state-issued identifications.  (*See* Doc. 87-7 at 8:1–12). Plaintiff alleges Cobbs was a "foodservice supervisor."  (Doc. 1 at 3, 10).  Defendant Cobbs denies having been in a supervisory position when the incident occurred.  (*See* Doc. 87-7 at 11:13–16).

¶ 12).  He had a total hip replacement on September 18 or 19, 2020.  (*See* Doc. 1 at 16; Doc. 97-1, ¶ 12).[3]

Defendants rely on the following evidence in support of their Motion: (1) Plaintiff's deposition transcripts (Doc. Nos. 87-1, 87-2); (2) the declarations of three inmates who witnessed the incident (Doc. Nos. 87-3 to 87-5); (3) grievance records (Doc. Nos. 87-6, 87-9); Defendant Cobbs's deposition transcript (Doc. 87-7); and (4) relevant provisions from the Environmental Health and Safety Manual (Doc. 87-8).  Defendants do not dispute the following facts: inmates "are required to wear proper footwear" when working in food service, (*see* Doc. 87-9 at 1; Doc. 87-7 at 18:4–19); Plaintiff was wearing "crocs" (not "proper footwear") when he slipped in the kitchen, (*see* Doc. 87-3, ¶ 3; Doc. 87-4, ¶ 5; Doc. 87-7 at 18:7–19:6); and medical staff did not arrive for hours after Plaintiff fell, (*see* Doc. 87-3, ¶¶ 3, 5; Doc. 87-4, ¶¶ 2–4).

According to a grievance Plaintiff authored on February 26, 2021, Defendant Jelks "called medical for a wheelchair (medical emergency) at about 4:30 a.m.," but medical did not arrive until about 10:00 a.m.  (*See* Doc. 87-6 at 1).  Three inmate-witnesses all agree that Plaintiff was wearing "crocs," not "special safety boots," and it took a "long time" for medical to arrive.  (*See* Doc. 87-3, ¶¶ 3, 5; Doc. 87-4, ¶¶ 4, 5; Doc. 87-5 at 1).[4] Two of the inmates estimate medical staff did not arrive for up to five hours, averring Plaintiff slipped at about 5:00 a.m. and was taken to the medical unit between 9:00 and 10:00 a.m.  (*See* Doc. 87-3, ¶¶ 3, 5; Doc. 87-4, ¶¶ 2, 4).  One inmate avers, "Officer Jelks

---

[3] Plaintiff also sued three prison medical providers for the delay in discovering his hip was broken.  (*See* Doc. 1 at 4, 14–15).  Those Defendants settled with Plaintiff.  (*See* Doc. Nos. 96, 100).

[4] The declaration at document number 87-5 contains no paragraph numbers.

was aware of the incident and said she would call medical." (*See* Doc. 87-3, ¶ 4). Another inmate avers, Plaintiff "was complaining of pain and asking for help the whole time," between about 8:00 a.m. and 9:00 to 10:00 a.m., when medical staff arrived. (*See* Doc. 87-4, ¶ 4). The third inmate avers security officers in the kitchen (presumably Defendants Jelks and Cobbs) "seemed skeptical" of Plaintiff's injury and "took a long time to question him [before] . . . call[ing] medical." (*See* Doc. 87-5 at 1).

Despite an inmate-witness averring that "the lack of issued boots for work was standard practice" in the kitchen at HCI, (*see id.*), Defendants concede that inmates are supposed to "have on boots" when working in the kitchen, (*see* Doc. 87-7 at 18:4–19; Doc. 87-9 at 1). Defendant Cobbs testified at her deposition that if an inmate shows up without boots, the officer assigned to the kitchen is supposed to have the inmate "get appropriate footwear." (*See* Doc. 87-7 at 18:4–19). A prison official who responded to a grievance Plaintiff submitted after the incident informed him of the relevant policy:

> Inmate uniforms including boots are inspected prior to entering food service, [sic] inmates are required to wear proper footwear while working in food service, [sic] any inmates that report to food service without the proper attire including footwear are sent back to the dorm and required to return in proper dress code. No inmates are allowed or forced to work without proper footwear in food service.

(*See* Doc. 87-9 at 1; *see also* Doc. 87-8 at 3, 4–5, 6).

The precise reason for the delay in medical staff arriving to help Plaintiff is vague at best, and the only evidence elucidating this issue comes from Plaintiff himself (through his Complaint, his declaration, a grievance, and his deposition testimony).[5] In his

---

[5] The only Defendant who offers testimony in support of the Motion for Summary Judgment is Cobbs, but she does not recall Plaintiff's slip-and-fall incident, nor does she recall any prison official telling Plaintiff that if he did not cook without the required safety

4

Complaint, Plaintiff alleges Defendants told him "he would have to wait for medical" and treated him as if he were "faking his injury." (*See* Doc. 1 at 12–13). In his declaration, Plaintiff avers Defendants "minimized [his] injuries and took no further action to help [him]" after Defendant Jelks said she would "alert the medical department." (*See* Doc. 97-1, ¶¶ 5, 6). In his February 26, 2021 grievance, Plaintiff blamed solely medical staff for the delay, saying, "Medical staff . . . should be held accountable for my pain and suffering." (*See* Doc. 87-6 at 1).

At his deposition, Plaintiff testified that Defendant Jelks said she would report a "medical emergency," but Plaintiff responded, "I'm thinking maybe I just might have popped my hip out of place. If I can pop it back in, I'll go back to work." (Doc. 87-1 at 19:17–23). When Plaintiff asked Defendant Jelks about thirty minutes later why medical was taking so long, he said Jelks told him—with Cobbs present—that medical staff were "doing COVID temperature checks," and they would arrive after they were finished. (*Id.* at 20:15–23). Plaintiff also said he "spoke to [Defendants] Cobb[s] and Jelks a couple of times about where medical was . . . and . . . . [t]hey just kind of blew [him] off." (*Id.* at 21:22–24). Plaintiff surmised Defendants Jelks and Cobbs "blew [him] off" because they suspected he "was faking [for] rebelling about the boots." (*Id.* at 23:15–22).

Plaintiff did not specify what he said to Defendants Cobbs and Jelks when he "spoke to [them] a couple times," nor did he clarify whether those "couple times" included the initial encounter with Defendant Jelks (when he told her he thought he "popped" his hip out of place) or the one thirty minutes later (when he asked what was taking so long).

---

boots, "he would lose gain time and get a DR." (*See* Doc. 87-7 at 12:20–13:4, 15:17–21).

He later stated vaguely that he "pled for five hours" but not necessarily with Defendants Jelks and Cobbs. (*Id.* at 25:6–7). With respect to the pain and the delay, Plaintiff testified as follows:

> Well, by this time I'm crying because I'm in that much pain. I'm in – I mean, now the pain is not – the pain was bad when I fell, but 30 minutes later it was – it was getting worse, and within the hour, I was – it was – it was too much. It was way too much for me.
>
> And really a lot of that at that point is real sketchy to me because of the pain I was going through, the situation I was in.

(*Id.* at 22:3–10).[6] Plaintiff said that when he was crying, the only people with him were other inmates, not Defendant Jelks or Cobbs. (*Id.* at 22:11–20). At count time, which was at about 8:00 or 8:15 a.m., other inmates "carried [Plaintiff] into the dining area," (*see* Doc. 87-3, ¶ 5; Doc. 87-4, ¶ 4), where inmates allegedly told Defendants Jelks and Cobbs that Plaintiff was "hurt," (*see* Doc. 87-1 at 22:21–23:12). About an hour after the security count, some inmates flagged down a sergeant who was walking into the building where the kitchen is located and told him an inmate was injured. (*See* Doc. 87-1 at 25:10–18; Doc. 87-3, ¶ 5; Doc. 87-4, ¶ 4). Plaintiff testified as follows:

> Sergeant Morgan came in. He unlocked the door, came in, approached me, asked me what was wrong. I explained to him. Sergeant Morgan is a volunteer fire fighter/EMT in the free world, so he recognized the injury. He called medical in front of me, and medical was there within five minutes with a stretcher.

(*See* Doc. 87-1 at 25:19–24). According to Plaintiff, "[O]n [the] way [to the medical unit], medical staff [told him], 'If you're faking, you're going to jail.'" (*Id.* at 26:16–18).

---

[6] It is unclear precisely when the injury manifested in serious pain. In a prison medical record titled, "Non-Traumatic Joint/Extremity Pain Protocol," completed at 10:15 a.m., a nurse noted the "[o]nset of pain" was fifteen minutes prior, or 10:00 a.m. (*See* Doc. 97-6 at 1). For purposes of this Motion, the Court accepts that Plaintiff was in varying degrees of pain the entire time he waited for medical to arrive.

6

## II.  LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Id.*  "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007).  Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted).  The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

### III. DISCUSSION

Plaintiff claims Defendants Wilson, Cobbs, and Jelks violated his right to be free from cruel and unusual punishment by forcing him to work in unsafe conditions (i.e., cooking without safety boots), and Defendants Cobbs and Jelks, who were the only two Defendants present during the incident, were deliberately indifferent to his serious medical needs. (*See* Doc. 1 at 6).[7]

Defendants invoke qualified immunity, arguing there is no genuine dispute that they violated a clearly established constitutional right. (*See* Doc. 87 at 21–23). As to the conditions of confinement claim, Defendants adopt Plaintiff's explanation that kitchen safety boots had to be redistributed to replacement food workers in July 2020 because many of the regular food workers were quarantined with COVID-19, and when Plaintiff reported back to work in September, no boots were available. (*Id.* at 16–17 (citing the Complaint and Plaintiff's deposition transcript)). As to the deliberate indifference claim, Defendants contend they satisfied their obligation to Plaintiff by "contact[ing] medical" after he fell, and the delay of between four to five and a half hours was "beyond [their] control" but rather attributable to prison medical providers being unavailable because they were conducting COVID-19 temperature checks. (*Id.* at 11, 13–15). Defendants argue the undisputed evidence demonstrates negligence at most, not deliberate indifference. (*Id.* at 21).

---

[7] Defendants contend Plaintiff also proceeds on a deliberate indifference claim against Defendant Wilson for the delay in seeking medical care for Plaintiff, (*see* Doc. 87 at 3), but Plaintiff does not allege such a claim against Defendant Wilson, who was not present when he fell, (*see* Doc. 1 at 6, 12–13).

8

"In order to receive qualified immunity, [a] public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation omitted).  There is no dispute that Defendants were acting within their discretionary duties with respect to the claims raised in the Complaint.  Where, as here, it is undisputed that Defendants were acting within the scope of their discretionary authority, the burden shifts to Plaintiff to prove that Defendants "(1) violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  Plaintiff must satisfy both prongs to survive a qualified-immunity defense.  *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019).

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).  As it relates to conditions of confinement, the Supreme Court has held, "It is cruel and unusual punishment to hold convicted criminals in unsafe conditions."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  As it relates to medical care, "the Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display 'deliberate indifference to serious medical needs of prisoners.'"  *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

Regardless of the specific context, "the deliberate-indifference standard sets an appropriately high bar." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020).  Indeed, the Eleventh Circuit recently reiterated just how high the bar is, reaffirming that to establish liability on an Eighth Amendment deliberate indifference claim, a prisoner-plaintiff must show the defendant acted with "subjective recklessness as used in the criminal law." *Wade v. McDade,* 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) (quoting in part *Farmer*, 511 U.S. at 839).  To demonstrate "subjective recklessness," a prisoner-plaintiff "must show that the defendant official was subjectively aware that his own conduct—[] his own actions or inactions—put the plaintiff at substantial risk of serious harm." *Id.* at 1258, 1262.

Under this standard, "liability requires consciousness of a risk." *Farmer*, 511 U.S. at 840.  The defendant prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  As such, a prisoner-plaintiff must point to evidence showing "the defendant prison official *actually* knew of a substantial risk of serious harm, not just that he *should have known*." *Wade*, 106 F.4th at 1257 (emphasis in original).  A prison official cannot be held liable under the Eighth Amendment for not appreciating that a prisoner faced a substantial risk of serious harm, even if "the risk was obvious and a reasonable prison official would have noticed it." *Farmer*, 511 U.S. at 842 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").

### A.     Conditions of Confinement

The duty to "take reasonable measures to guarantee the safety of [prisoners in their care]," *id.* at 832, does not make prison officials "the guarantor[s] of [prisoners'] safety," *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313, 1321 (11th Cir. 2005). As such, not every injury that a prisoner suffers because of an unsafe prison condition equates to a constitutional violation. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1333 (11th Cir. 2013). To establish that his conditions of confinement violated the Eighth Amendment, a prisoner must point to evidence permitting the reasonable inference that the defendant was deliberately indifferent to conditions that were "sufficiently serious." *See Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir. 2004). Conditions of confinement are "sufficiently serious" only if they are so extreme that they expose the prisoner to "an unreasonable risk of serious damage to [a prisoner's] future health or safety." *Id.* at 1289.

"Showing a substantial risk of serious harm requires the prisoner to provide evidence that there was a 'strong likelihood' of his injury occurring." *Visage v. Woodall*, 798 F. App'x 406, 408 (11th Cir. 2020) (citing *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015)). A court's consideration of whether there was a strong likelihood, as opposed to a "mere possibility," of an injury occurring cannot be based on "hindsight bias." *Brooks*, 800 F.3d at 1301. Accordingly, a prisoner cannot survive summary judgment based solely on evidence of past isolated incidents or his own injury. *Visage*, 798 F. App'x at 408. Rather, the prisoner must demonstrate that the complained-of condition— most commonly inmate-on-inmate violence—resulted in so many incidents or injuries that

11

such incidents or injuries were "the norm or something close to it." *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (quoting *Purcell*, 400 F.3d at 1322)).

For instance, in *Purcell*, the court held evidence of "several inmate-on-inmate fights" occurring over several months before the incident did not establish "that serious inmate-on-inmate violence was the norm or something close to it." 400 F.3d at 1318, 1322. In *Brooks*, the court held the plaintiff failed to state a plausible deliberate indifference claim against guards who placed him in a cell near an inmate who threatened him within days of his arrival. 800 F.3d at 1298. The plaintiff reported the threat and expressed that he feared for his safety. *Id.* Less than a month later, all cell doors in the dorm mistakenly opened at the same time, resulting in a riot during which the plaintiff's neighboring inmate carried out his threat, seriously injuring the plaintiff. *Id.* at 1298–99. The court concluded the plaintiff had alleged only the "mere possibility" that he would be harmed even though some of the cell doors in the housing unit had malfunctioned in the past. *Id.* at 1301; *see also Visage*, 798 F. App'x at 409–10 (affirming the district court's grant of summary judgment in favor of the defendant prison officials where the plaintiff demonstrated only one similar instance of a broken prison window causing an injury in the past twenty years).

"[I]n the work assignment or workplace safety context, prison officials are deliberately indifferent when they 'knowingly compel convicts to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful.'" *Lee v. Sikes*, 870 F. Supp. 1096, 1100 (S.D. Ga. 1994) (quoting *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir.1977))). Even if an injury can be attributed to an official's policy or conduct, the prisoner-plaintiff still must demonstrate that the risk of

harm was "substantial," not just possible. *See, e.g.*, *Lakin v. Barnhart*, 758 F.3d 66, 70–71 (1st Cir. 2014) (Souter, J., sitting by designation) (affirming summary judgment in favor of defendant prison officials who permitted inmates to possess padlocks without restriction even though padlock assaults occurred about two times per year).[8]

Here, it is undisputed that food service workers must wear boots in the kitchen. (*See* Doc. 87-7 at 18:7–9; Doc. 87-8 at 3–5; Doc. 87-9 at 1).  It is also undisputed that no boots were available when Plaintiff returned to food service in September 2020, so he was required to cook wearing crocs.  (*See* Doc. 87 at 16–17 (accepting Plaintiff's contention that no boots were available and the reason why)).[9]  But there is no evidence Defendants Jelks, Cobbs, or Wilson knew that forcing Plaintiff to wear crocs instead of boots would put him at a substantial risk of serious harm such that they can be held liable under the stringent Eighth Amendment standard.  The evidence to which Plaintiff points permits only the reasonable inference that Defendants knew of a possibility of harm if Plaintiff were forced to work in the kitchen wearing crocs.  Indeed, the only evidence of prior similar incidents occurring are Plaintiff's own fall in December 2019, which resulted in minimal injuries (not broken bones), and Plaintiff's unsubstantiated and unexplained assertion at his deposition that "several people . . . fell in food service while . . . . [wearing] [c]rocs."  (*See* Doc. 87-1 at 14:14–23, 19:15–18).

---

[8] The parties cite and the Court has identified no decision by the Eleventh Circuit addressing an Eighth Amendment claim in the context of prison working conditions.

[9] Plaintiff argues there are multiple disputes in the record as demonstrated by the fact that Defendants denied nearly every one of his requests for admissions, including that kitchen workers are normally provided boots, Plaintiff asked for boots but his request was denied, and Plaintiff was threatened with a DR if he did not cook.  (*See* Doc. 97 at 9–10).  Even accepting Plaintiff's version of facts, he fails to demonstrate a constitutional violation.  As such, the Court accepts his version of events as undisputed.

Accepting as true that Defendants knew of prior isolated incidents yet gave Plaintiff an ultimatum—work in the kitchen wearing crocs or face a DR—there is no evidence that inmate food service workers routinely sustained serious injuries from slip-and-falls caused by unsafe footwear to the extent that such incidents were "the norm." *See Purcell*, 400 F.3d at 1324 ("'Reasonable care' under tort law is not the same thing as reasonable safety within the meaning of the federal Constitution."). On this evidence, the Court cannot conclude Defendants were aware of a substantial risk of serious harm and, with such knowledge, were deliberately indifferent to the risk. Accordingly, they are entitled to qualified immunity on this claim.

### B. Medical Care

In the medical context, deliberate indifference to an inmate's serious medical needs constitutes the unnecessary and wanton infliction of pain. *Estelle*, 429 U.S. at 105 ("Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983."). Indeed, the Eleventh Circuit has held, "The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to . . . constitute deliberate indifference." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *see also Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("[A] prison inmate has the right under the Eighth Amendment to be free from deliberate indifference to serious physical or psychiatric needs.").

However, it has long been understood that negligence does not equate to deliberate indifference. *See, e.g.*, *Farmer*, 511 U.S. at 837–38; *Wilson v. Seiter*, 501 U.S. 294, 299 (1991) ("It is *obduracy and wantonness, not inadvertence or error in good faith,*

14

that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." (emphasis in original) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986))); *Estelle*, 429 U.S. at 105 ("An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain.").

Defendants do not dispute that Plaintiff had a serious medical need. (*See* Doc. 87 at 11). Rather, they argue the undisputed delay in Plaintiff receiving medical attention was not attributable to their actions or inactions. (*Id.* at 13–14). Viewing the facts in the light most favorable to Plaintiff, the Court concludes Defendants did not violate a clearly established constitutional right because the evidence does not permit the reasonable inference that Defendant Cobbs or Jelks was "conscious[] of a risk" of harm to Plaintiff in the hours after he slipped or that, with such knowledge, acted with criminal recklessness. *See Farmer*, 511 U.S. at 840; *Wade*, 106 F.4th at 1255. Plaintiff himself maintains that Defendant Jelks told him she would call in a "medical emergency" immediately after he reported his fall to her, but he told her he may have only popped his hip out of place and, if he could "pop" it back in, he would "go back work." (*See* Doc. 1 at 12; Doc. 97-1, ¶ 5; Doc. 87-1 at 20:17–21:16). Thus, to the extent Defendant Jelks did not immediately call for medical assistance, Plaintiff's own testimony suggests that she responded "reasonably" based on what she knew. *See Wade*, 106 F.4th at 1255 ("[A] defendant who 'respond[s] reasonably' to a risk, even a known risk, 'cannot be found liable' under the Eighth Amendment." (internal citations omitted) (quoting *Farmer*, 511 U.S. at 837, 844)).

Plaintiff also claims that at some point later—perhaps after he realized he could not "go back to work"—Defendants Jelks and Cobbs "blew him off," and perhaps thought he was faking an injury. (*Id.* at 20:21–23, 24:15–22). It became clear days later that Plaintiff was seriously injured, but Defendants Jelks and Cobbs must be judged on what they knew at the time, not on what they should have known, and not based on "hindsight bias." *See Brooks*, 800 F.3d at 1301; *Wade*, 106 F.4th at 1257. According to Plaintiff and the inmates who witnessed the incident, what Defendants Jelks and Cobbs knew was that Plaintiff fell and had asked "security to call medical." (*See* Doc. 1 at 12–13; Doc. 97-1, ¶¶ 5, 6; Doc. 87-1 at 19:17–23, 20:15–23, 21:22–24; Doc. 87-3, ¶ 4; Doc. 87-4, ¶ 3; Doc. 87-5 at 1). According to Plaintiff (at his deposition) and at least one inmate-witness, Plaintiff "pled for five hours" or "complain[ed] of pain . . . the whole time," and at one point cried because of the pain. (*See* Doc. 87-1 at 22:3–10, 25:6–7; Doc. 87-4, ¶ 4).

Accepting that Plaintiff pleaded and complained for five hours and cried, there is no evidence he pleaded or complained *with or to* Defendant Jelks or Cobbs, nor is there evidence either Defendant knew or saw that he had cried. Moreover, neither Plaintiff nor the three inmate-witnesses describe the substance of any conversations Plaintiff had with Defendant Jelks or Cobbs other than the two interactions Plaintiff testified he had with Defendant Jelks—the first, when Plaintiff told Defendant Jelks he might be able to return to work, and the second thirty minutes later, when Plaintiff asked Defendant Jelks (in Defendant Cobbs's presence) why medical was taking so long. (*See* Doc. 87-1 at 19:17–23, 20:15–23). Indeed, in his declaration, Plaintiff avers only that he "appealed to Defendants Cobb[s] and Jelks to get [him] help," but they "minimized [his] injuries and took no further action." (*See* Doc. 97-1, ¶ 6). He does not explain what he said to either

16

Defendant in "appeal[ing]" to them, but he does detail over the next six paragraphs what happened after medical staff arrived. (*See id.* ¶¶ 6–12). The lack of any description whatsoever of conversations or interactions Plaintiff had with either Defendant between the time Plaintiff "appealed . . . [for] help" and when medical staff arrived speaks volumes. Here, there is only a "scintilla of evidence" supporting Plaintiff's claim, which is insufficient for a jury's consideration. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

The facts and circumstances in this case are materially different from those in the *Brown* case, on which Plaintiff relies. (*See* Doc. 97 at 14). For example, there is no evidence Defendants observed visible signs of a broken bone, such as swelling or disfigurement, nor does Plaintiff claim to have told Defendants he thought he broke a bone. *Cf. Brown v. Hughes*, 894 F.2d 1533, 1538–39 (11th Cir. 1990) (holding a prison guard was not entitled to summary judgment where the plaintiff said he thought his foot was broken, and the guard saw the plaintiff was limping and his foot was swollen, yet he did not "send someone to look at [the plaintiff's foot]" despite his promise to do so). On the contrary, Plaintiff initially told Defendant Jelks he thought he may simply have popped his hip out of place and could return to work if he could "pop" it back in. (*See* Doc. 87-1 at 20:17–20).

Based on Plaintiff's own statements and those by the inmate-witnesses, the evidence permits one of two conclusions: Defendant Jelks or Cobbs wrongly concluded Plaintiff was faking an injury or was not seriously injured (no consciousness of a risk); or, regardless of whether Defendant Jelks or Cobbs appreciated the seriousness of Plaintiff's

17

injury, medical staff were delayed for reasons beyond Defendants' control (no intent). In either case, the evidence does not permit the reasonable inference that Defendant Jelks or Cobbs was deliberately indifferent to a serious medical need.

First, to the extent the delay was attributable to Defendants Jelks's or Cobbs's failure to appreciate the severity of Plaintiff's injury, their "failure to alleviate a significant risk that [they perhaps] should have perceived but did not . . . cannot . . . be condemned as the infliction of punishment."[10] *See Farmer*, 511 U.S. at 838; *see also Marbury*, 936 F.3d at 1238 (explaining that a prison official's "failure to investigate [an inmate's] allegations of threats or to follow policy in reporting potential threats up the chain of command" does not constitute deliberate indifference absent allegations or proof of the official's "subjective awareness of a serious risk of harm"). This is true even if Plaintiff vaguely "complained" for hours (maybe in the presence of one or both Defendants) or "spoke to [one or both Defendants] a couple of times about where medical was."[11] *See*

---

[10] Significantly, Defendants Jelks and Cobbs are not medical providers. It was not until a trained firefighter/EMT evaluated Plaintiff that the seriousness of Plaintiff's injury was appreciated. (*See* Doc. 87-1 at 25:21–24).

[11] Whether Plaintiff spoke directly with Defendant Cobbs is unclear. Defendant Cobbs does not recall the incident, (*see* Doc. 87-7 at 15:17–21), and Plaintiff mentions by name primarily Defendant Jelks in explaining with whom he spoke, (*see* Doc. 1 at 12; Doc. 87-1 at 19:17–23, 20:15–25; Doc. 97-1, ¶¶ 5, 6). As such, evidence of Defendant Cobbs's state of mind is particularly lacking. Whether a plaintiff can overcome summary judgment on qualified immunity in a deliberate indifference case requires an "individualized assessment[]" of what each defendant knew. *See Paulk v. Ford*, 826 F. App'x 797, 804 n.5 (11th Cir. 2020) (citing cases and summarizing the standards for assessing whether a defendant is entitled to qualified immunity and had the requisite culpability in the deliberate indifference context). In other words, what one defendant knew may not be "imputed" to another. *See Nam Dang ex rel. Vina Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew]." (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008)).

*Carter v. Galloway*, 352 F.3d 1346, 1349–50 (11th Cir. 2003) (holding the plaintiff could not overcome summary judgment based on his vague reports to prison officials that his cellmate was engaging in strange behavior, because to find the defendants had the requisite culpability would require an "inferential leap" and "unduly reduce awareness to a more objective standard"). In the words of the Eleventh Circuit, "It bears repeating that deliberate indifference is *not* a constitutionalized version of common-law negligence." *Swain*, 961 F.3d at 1288 (emphasis in original).

Second, to the extent the delay was solely attributable to special protocols necessitated by a COVID-19 outbreak, Plaintiff points to no evidence that any such delay was caused by or within the control of Defendants Jelks and Cobbs. Moreover, people in the "free world" at that time were experiencing similar delays in receiving necessary and in some cases life-saving medical care because of COVID-19. *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1276 (11th Cir. 2020) (explaining that real-world "medical-care considerations made by most non-prisoners in our society" are relevant in a deliberate indifference analysis).

In short, there is no evidence that Defendant Jelks or Cobbs was "conscious[] of a risk" of harm to Plaintiff even though each knew he had fallen and had requested medical attention, nor can either one's conduct be described as criminally reckless. To be sure, Plaintiff undoubtedly experienced serious pain while waiting for medical to arrive. That pain is not to be diminished. However, on the evidence presented, these Defendants cannot be held to account for the delay as a violation of the Eighth Amendment. As such, Defendants Jelks and Cobbs are entitled to qualified immunity on this claim.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment (Doc. 87) is **GRANTED**.

2. The **Clerk** is directed to enter judgment in favor of Defendants Wilson, Cobbs, and Jelks, and close the file.

3. The **Clerk** shall correct the docket to reflect the proper spelling of Defendant Cobbs's last name (with an 's' at the end).  (*See supra* note 2).

**DONE AND ORDERED** in Jacksonville, Florida, on October 17, 2024.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Jax-6
c:
Counsel of Record